**Dan MARTEL, Plaintiff,**

v.

**The CITY OF NEWTON, KANSAS, Mark Detter and Robert D. Myers, Defendants.**

**No. 98–1391–JTM.**

United States District Court, D. Kansas.

Oct. 7, 1999.

See also 6 F.Supp.2d 1243.

Cortland E. Berry, Newton, KS, for Plaintiff.

Robert D. Myers, Myers Law Offices, Chartered, Newton, KS, James S. Pigg, Fisher, Patterson, Sayler & Smith, Topeka, KS, for Defendants.

## MEMORANDUM ORDER

MARTEN, District Judge.

The present matter is before the court on the defendants' motion for summary judgment. Plaintiff Dan Martel has brought various claims against the defendants arising from the condemnation of a certain property located in Newton, Kansas. The court has previously addressed the efforts of the City of Newton to enforce certain housing regulations in *Martel v. City of Newton,* 6 F.Supp.2d 1243 (D.Kan.1998). For the reasons stated herein, the court will grant the relief requested by defendants.

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the court must examine all evidence in a light most favorable to the opposing party. *McKenzie v. Mercy Hospital,* 854 F.2d 365, 367 (10th Cir.1988). The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt. *Ellis v. El Paso Natural Gas Co.,* 754 F.2d 884, 885 (10th Cir.1985). The moving party need not disprove plaintiff's claim; it need only establish that the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.,* 812 F.2d 1319, 1323 (10th Cir. 1987).

In resisting a motion for summary judgment, the opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. Rather, the nonmoving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and

significant probative evidence supporting the allegation. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts. "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial.*'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting Fed. R.Civ.P. 56(e)) (emphasis in *Matsushita*). One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

### Findings of Fact

Samuel and Blanche Froelich owned 26 houses or parcels of real estate in the city of Newton. Samuel Froelich was in poor health and having difficulty maintaining his properties, resulting in complaints from the city. Martel, who is self-employed in the business of remodeling and selling houses, approached Froelich in the fall of 1995, proposing to begin to remodel Froelich's properties and sell them. Froelich was reluctant at first, but agreed to the proposal in early 1996.

Martel has conceded that, in their deteriorated and dilapidated condition, the Froelich properties had been a "thorn in the city's side." (Martel Dep. at 92). The city had filed several complaints against the Froelichs in Municipal Court for nuisance ordinance violations which resulted in guilty pleas or convictions. The Froelichs had received numerous notices from the city regarding violations of city ordinances.

On August 28, 1996, the city filed a petition in Harvey County District Court against Samuel and Blanche Froelich, asserting that certain properties owned by the Froelichs, including 312 Allison and 332 East 5th within the city of Newton, violated nuisance provisions of the Newton City Code. The city's petition asserted that numerous notices had been issued to one or both of the Froelichs regarding such violations, that superficial repairs would be made but that the properties continually fell back into disrepair in violation of the city code nuisance provisions. The city sought an injunction compelling the Froelichs to bring the properties into compliance with city code nuisance provisions and restraining them from further violations of the nuisance provisions. The city also requested that if the plaintiff failed to comply with any injunction issued, the city should be granted authority to bring the subject properties into compliance with city code nuisance provisions and obtain judgment for reimbursement of costs and expenses.

Martel has agreed that the Froelich properties identified in the city's petition were in violation of the city nuisance ordinances.

Prior to filing of the lawsuit by the city on August 28, 1996, Martel had reached a full agreement including price as to only three of the Froeliche properties. Martel entered other written contracts to purchase properties of the Froelichs after becoming aware of the city's lawsuit, including 332 East 5th on September 23, 1997, and 312 Allison on April 18, 1998.

Through the contracts, Martel and Froelich agreed on a purchase price. Martel would then repair and sell the property to a third party with the title and money being exchanged at closing of the sale to the third party. During the pendency of the *Froelich v. City,* the city provided lien releases to the Froelichs' attorney when a sale of Froelich property was arranged so that the pendency of the injunction action would not preclude the Froelichs from selling their property. The city always promptly provided lien releases for the properties upon request.

Through discovery in the state action, the city requested entry upon land and inspection of property under K.S.A. 60–234. On May 21, 1997, an objection was filed to the request for inspection of properties at 312 Allison and 332 East 5th and other properties by Cortland Berry, the attorney representing the Froelichs. The state court overruled plaintiff's objections to inspection. Mr. Berry then asserted that the Froelichs no longer owned the properties, including 312 Allison and 332 East 5th. Based upon representations by counsel for the Froelichs, the court found the Froelichs no longer owned the property subject to the injunction action, except for property at 309 East 5th. The court permitted the city to perform an inspection of the property at 309 East 5th, but determined that the city's request for inspection of the other six properties was moot.

On February 13, 1998, the state court was informed that an issue remained whether the Froelichs continued to own the other six properties that had been the subject of the city's request for inspection. On February 13, 1998, the court held that the city was "entitled to conduct inspections as to each of the said six properties as to which the defendants have not conveyed an ownership interest" but limited the inspection to the exterior of residential structures "with the right to later conduct any inspection of the interiors of the residences and any attached garages being dependent upon a showing that there is evidence determined from the exterior inspection establishing a reasonable basis to believe that conditions may exist in violation of the City's 'nuisance and dangerous structure' ordinances as to which an interior inspection is necessary." (Def.Exh. 12). The court also ordered that such inspections "shall not be conducted, however, until plaintiff's counsel has met with Dan Martel and received a confirmation that he does not claim any ownership interest in these six properties. If he does claim an ownership interest in any of those properties, then no inspections shall be conducted as to any such property until the matter is brought back before the Court for further proceedings in this regard." (Id).

On April 24, 1998, Blanche Froelich answered interrogatories admitting that she and her husband owned fee simple title for the six properties in question, including 332 East 5th. She stated that she had an agreement on price with Dan Martel to sell him three of the properties, including 332 East 5th, but no agreement on price as to the other three properties, including 312 Allison.

On May 29, 1998, the state court conducted an evidentiary hearing regarding the issue of ownership of the six properties. At the hearing, Dan Martel testified that he had an initial oral agreement with Samuel and Blanche Froelich whereby he proposed to rehabilitate various of their rental properties and place those on the market for sale, that when he was ready to start work on a specific property, he would reach an agreement on the amount of money the Froelichs would receive from the property, place that agreement in writing, and then proceed with rehabilitation work on that property. Once the property was rehabilitated and sold, the Froelichs would receive the agreed amount of money from the proceeds of the sale and Martel would receive the balance. Martel testified that he had a contract on property at 332 East 5th Street and had just obtained a contract on 312 Allison. He testified that pursuant to the contracts he had the right to go onto the property and refurbish whatever is necessary to get it into a saleable condition. Martel said there had been no deed transfers from the Froelichs on any of the properties, and title remained in Mr. or Mrs. Froelich's name. When the property was sold to a third party, the title company secured a deed from the Froelichs to Martel and Martel then provided a deed from himself to the buyer. Mrs. Froelich would not sign a deed to the property until the day of closing or the day before. She remained the owner of the properties but Martel had an interest in them to the extent he put money in.

After hearing the evidence on May 29, 1998, the state court ruled that Martel had only a contract to improve the properties and obtain profit when the properties were sold and that to the extent that Martel had an interest, he took that interest subject to the pending injunction action filed by the city. The court found that the properties remained titled in the name of one or both of the Froelichs, and that the arrangement between the Froelichs and Martel did not transfer any property title to Martel until the closing on the sale of a property to a third party buyer. The court therefore ordered that the city was entitled to inspect the properties at 312 Allison and 332 East 5th Street under a two-step procedure of exterior and interior inspections.

On June 18, 1998, the city's inspection team conducted exterior inspections of the properties, including 332 East 5th and 312 Allison. The city attorney, Bob Myers, then notified plaintiff's attorney, Cortland Berry, of an intent to seek interior inspections on three of the five properties inspected, including 332 East 5th and 312 Allison. Myers told Berry that the inspection team considered the properties at 332 East 5th and 312 Allison to be "candidates for demolition," but that "[a] final opinion cannot be formulated until after the interior inspections are completed." (Def.Exh. 15). On July 27, 1998, the city filed a motion in the injunction action asking for an order for an interior inspection of three properties, including 332 East 5th and 312 Allison. This motion was heard four days later. After hearing testimony of a member of the city's inspection team, architect Tim Dudte, the court found the house at 332 East 5th could be a public danger and held that the city was entitled to conduct an interior inspection. (Def.Exh. 9).

On the morning of the inspection, the city secured a title search from an abstract and title company, the Regier Agency, and received notification that a title search accurate as of 7:59 a.m. August 4, 1998, showed that title to 312 Allison was placed in Dan Martel and title to 332 East 5th was held by Samuel J. Froelich. Because the title search revealed that the title to 312 Allison had passed to Dan Martel, the city canceled the interior inspection of that property. Since Martel acquired the deed to 312 Allison, the city has done nothing with respect to that property.

At 1:00 p.m. on August 4, 1998, City Attorney Robert Myers and the city's inspection team arrived at 332 East 5th to perform the interior inspection pursuant to the order of the State District Court. No representative of the Froelichs or Dan Martel was present to provide access to the interior of the structure although notified of the inspection.

Ultimately, the city dismissed its injunction action without prejudice because the condition of some of the subject properties was corrected and other properties had been transferred. The city decided to resolve problems with the remaining Froelich properties through administrative procedures.

On September 8, 1998, the Newton City Commission adopted Resolution No. G–717 finding probable cause to believe that the structure at 332 East 5th Street was unsafe and dangerous to public health and safety and establishing a date for a hearing on October 27, 1998, to determine whether the structure constituted an unsafe and dangerous structure and nuisance which should be condemned and ordered repaired or demolished. On September 17 and September 24, 1998, Resolution No. G–717 was published in *The Newton Kansan*, the official newspaper of the Newton City Commission. On September 18, 1998, Robert Myers, City Attorney, mailed letters to Blanche Froelich and Dan and Elaine Martel notifying of the adoption of Resolution G–717 and the hearing date. A return receipt was signed by Dan Martel on September 19, 1998, showing receipt of Bob Myers's September 18, 1998 letter.

A hearing was held on October 27, 1998. Blanche Froelich was present. Dan Martel was present with his attorney, Cortland Berry. They made a presentation regarding the property at 332 East 5th. City staff presented evidence regarding the

condition of the property, including written reports by the members of the inspection team from inspections of June 18, 1998, and August 4, 1998. The presentation included oral testimony from Terry Williams, Tim Dudte, Steven Kay and Mark Detter. The estimated cost of repairs presented by the inspection team was $20,815.00 not including the costs of correcting plumbing and mechanical code violations nor the cost of stabilizing flooring and miscellaneous cleanup. The county appraiser's office had appraised the value of the structure at $15,130.00. A report of a real estate agent, Dick McGlachlin, indicated the structure had no market value.

Martel acknowledges he was present at the hearing with his attorney. However, he suggests in his response to the motion for summary judgment, that he was prevented from presenting additional evidence since it was only at the hearing that he learned that evidence would be presented. However, the notice of the hearing, which Martel acknowledges receiving, expressly states at the hearing "the City's inspection staff and perhaps other witnesses will present evidence [after which] you and any other interested party will be entitled to offer any evidence on this matter." (Def.Exh. D).

At the hearing, Dan Martel generally disagreed with the projected repair cost, but acknowledged that the repairs might cost $20,000.00. He asked for an opportunity to repair the property for resale to a prospective buyer. The city commission voted to continue the matter to the next meeting on November 10, 1998, and directed the city attorney to prepare a draft resolution with findings based upon the evidence presented at the hearing but providing an opportunity for interested parties to present a repair plan as an alternative to demolition of the structure.

On November 10, 1998, the city commission further considered the issues relating to 332 East 5th. Dan Martel was present and requested another week to submit a repair plan for the property. Martel conceded before the city commission that 332 E. 5th required approximately $20,000.00 in repairs to be habitable. He did not dispute the evidence that the property was infested with rodents and pests, that the electrical system required replacement, that the plumbing must be replaced, that a heating and air conditioning system was required, windows and doors had to be installed, the roof replaced and other work performed.

The city commission adopted Resolution No. G–725 finding the presence of nuisance and dangerous structure conditions on the property, finding that the cost of repairs exceeded 50% of the value of the structure, and continuing the question as to whether the commission would order the repair or demolition of the structure until the commission's next regular meeting on November 24, 1998, in order to provide interested parties with an opportunity to provide a repair and renovation plan for the property. A copy of Resolution G–725 was mailed to Blanche Froelich and Dan and Elaine Martel on November 11, 1998.

The administrative proceedings resumed on November 24, 1998, with Dan Martel, attorney Cortland Berry and Blanche Froelich present. Martel presented a proposed repair and renovation plan by a letter dated November 24, 1998, from Cortland Berry to Robert Myers. The city commission expressed concern that Martel's proposed plan did not address all elements of structural problems found to exist and did not contain other items required by Resolution No. G–725. After discussion, the city commission adopted Resolution No. G–726 ordering demolition of the structure. On November 25, 1998, City Attorney Myers mailed a letter to Blanche Froelich and Dan and Elaine Martel transmitting a copy of Resolution No. G–726. A certified copy of Resolution G–726 was transmitted to Blanche Froelich and Dan and Elaine Martel on December 2, 1998. Martel and Froelich have appealed that decision to the Harvey County District Court.

Martel never lived in 332 E. 5th and never intended to live there.

### Conclusions of Law

The present action, of course, is very similar to the claims previously advanced in *Martel v. City of Newton*, 6 F.Supp.2d 1243 (D.Kan.1998). The action here is somewhat more limited, focusing directly on the property at 332 E. 5th Street which was ordered demolished on November 24, 1998. Specifically, Martel contends (1) his Fourteenth Amendment rights were violated when he failed to receive substantive or procedural due process in the condemnation, (2) that his Fifth Amendment rights were violated by the interior inspection of the property, and (3) that his constitutional right to privacy was violated when photographs of the interior of the residence were introduced into evidence in the condemnations proceedings. In addition, Martel makes various claims under state law.

■ Blanche Froelich has also advanced claims in matters arising from the condemnation. Her claims were recently rejected by Judge Brown in *Froelich v. City of Newton*, 60 F.Supp.2d 1163, 1166–68 (D.Kan.1999) (record citations omitted). The court wrote:

The defendant correctly asserts that any "takings" claim must be analyzed under the Fifth, not the Fourteenth, Amendment. *See Miller v. Campbell County*, 945 F.2d 348, 352 (10th Cir. 1991); *See also Landmark Land Co. of OK, v. R.E. Buchanan*, 874 F.2d 717 (10th Cir.1989). Although the plaintiff may wish to argue a "takings" claim under the Fourteenth Amendment, the Supreme Court has yet to hold that such an analysis is warranted when the facts of a case clearly fall within the purview of another enumerated right. *See Id.* at 352–53 (*citing Graham v. Connor*, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)). With this in mind, the court must first determine if the plaintiff has a valid takings claim under the Fifth Amendment's Just Compensation Clause.

The plaintiff's Fifth Amendment claim must fail on both procedural and substantive grounds. First, the plaintiff's Fifth Amendment claim has not matured because there is no evidence the plaintiff has exhausted all possible alternatives for recovering her just compensation from the City or State. *See Williamson County Regional Planning Commission v. Hamilton Bank of Johnson City*, 473 U.S. 172, 194–95, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985). The Fifth Amendment does not prohibit the government from taking property, it only prohibits the government from taking property without giving the owner just compensation. *See Id.* at 194, 105 S.Ct. 3108.

Second, as a substantive matter, it is clear the defendant's conduct is within its police powers of regulating nuisance-like land uses, and, as such, no compensation is required unless the property is deprived of all its economically beneficial uses. *See Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1015–16, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992). The plaintiff fails to allege that all economically beneficial use of her properties has been lost due to the City's actions. Instead, the plaintiff claims the City's pursuit of an injunction against her properties prevented a sale of her properties for their full market value. Unfortunately for the plaintiff, a diminution in value is not necessarily enough to sustain a takings claim. *See Penn Central Transportation Co. v. City of New York*, 438 U.S. 104, 131, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978). Discriminatory use of the law, which causes a diminution in value, does not require just compensation if (1) the government has a valid police power goal, (2) the statute employs means reasonably related to establishing that goal, and (3) the burden is imposed on all similarly situated property owners for the benefit of the whole community. *See Id.* at 133–34, 98 S.Ct. 2646 and f.n. 30 at p. 134. As the court has already ruled, the City's pursuit of injunctive relief was reasonably related

to the City's goal of regulating nuisance-like uses of land to protect the community's health and safety. Therefore, the court finds the City's actions did not constitute a compensable taking and the plaintiff has no recoverable Just Compensation claim.

As for the plaintiff's Due Process claim, the court finds the plaintiff has failed to offer evidence which would support such a claim. Substantively, the plaintiff failed to show the defendant acted with reckless intent and in a manner that shocks the conscience of the court. *See Williams v. City and County of Denver*, 99 F.3d 1009, 1015 (10th Cir. 1996) (overruled on other grounds). Even when looking at the evidence in the light most favorable to the plaintiff, the court cannot say the City's conduct was reckless or shocking. The plaintiff did not suffer any loss of property rights, including the right to transfer ownership. While the plaintiff claims the City's civil suit interfered with her ability to sell her properties, the evidence is that any delays in the plaintiff's acquisition of lien releases were not the fault of defendant.. In short, the filing of a civil suit against the owners of consistently substandard properties in an attempt to secure more permanent compliance with the City's health and nuisance ordinances is neither reckless nor shocking to the court's conscience.

Procedurally, the plaintiff's Due Process claim fails for the same reason that her Just Compensation claim has failed: the plaintiff has not availed herself of the procedures provided by the State of Kansas for acquiring just compensation for a compensable taking. Plaintiff has failed to show that no effective procedure is available to pursue her due process rights. Under these circumstances, the court grants summary judgment on the plaintiff's Due Process and/or Takings claim.

60 F.Supp.2d at 1166–68 (record citations omitted).

■ The court finds that the motion for summary judgment must be granted.

As to the claim of due process violation, as Judge Brown correctly concluded, such claims in the present context cannot be made in the context of a broad Fourteenth Amendment claim; the plaintiff must instead plead and prove a violation of the more specific prohibition of unreasonable takings under the Fifth Amendment. Here Martel has never asserted any claim under the Fifth Amendment, and his recent request for leave to amend his complaint was denied by the magistrate judge as dilatory. Moreover, even if the court were to analyze Martel's claim as a Fifth Amendment claim, it must be rejected on the merits. Martel received due process in the administrative hearings—he received notice of the hearings, was allowed to and did have his attorney present, and was informed that he could present evidence. Martel received these protections even though, at the time of the condemnation, he had no legal title in the property in question. As to the claim of a violation of his substantive due process rights, Martel has failed utterly to demonstrate the defendants acted with reckless intent or a manner that shocks the conscience of the court.

The claims of illegal entry and invasion of privacy will also be dismissed. The entry into the property occurred as the result of an order by the state court. Martel now contends that title to the property was actually held not by Blanche Froelich but by the estate of her (by then) late husband, Samuel Froelich, and that as a result the court had no jurisdiction to enter the order allowing the inspection.

■ The court rejects this argument for several reasons. First, Samuel Froelich was alive at the time the injunction action was first filed, so it is not clear that the state court would have been without jurisdiction to enter the order. Second, even if the court did not have in personam jurisdiction over Martel, it had in rem jurisdiction regarding the inspection of the residence in question. The entry was made pursuant to a lawful court order. Third,

**1264**

Martel and his current counsel appeared at the hearing, and his counsel affirmatively represented to the court that it could proceed to address the issues in the action. Martel is estopped from arguing that the court's order was without jurisdiction. Fourth, by the plaintiff's own argument, title to the property belonged to the estate of Samuel Froelich and not to Martel. Martel has no standing to bring the claim for illegal entry or invasion of privacy. Finally, the introduction into evidence of photographs of the interior of the residence was appropriate in the attempt to determine whether the residence required condemnation.

■ In addition to these considerations with respect to the federal claim, the court agrees with defendants that the defendants are protected by prosecutorial immunity and qualified immunity, and that punitive damages cannot be awarded against the defendants. It may be noted that these arguments receive nothing more than conclusory rejoinders by the plaintiff, with no authority cited in support. (See Resp., at 21–22). The court finds the defendants are protected by prosecutorial and qualified immunity.

■ Martel's state claims include abuse of judicial process, interference with contractual rights, and trespass. These claims will also be dismissed. First, Martel never filed any notice of claim with the defendants as required by K.S.A. 12–105(b). Although Martel notes that he did file a notice of claim with the city on July 9, 1997, that notice related only to the issues involved in the earlier litigation, *Martel v. City of Newton*, 6 F.Supp.2d 1243, 1248 (D.Kan.1998). That notice was filed well before, and therefore made no reference to, the events in 1998 which form the basis for the current litigation. That notice cannot meet the requirements of K.S.A. 12–105(b) for the claims raised herein.

In addition, the state claims are defective on the merits. The claim of abuse of process is without merit, since Martel was never a party to the injunction action, only

the Froelichs were. Further, at the time of the condemnation, the evidence fails to show any existing contract which the city's actions interfered with. Even if such a contract existed, the existence of the continuing nuisance justified the city's action to protect the public welfare. Finally, the trespass claim should be dismissed since a limited entry onto the property pursuant to court order and for purposes of conducting a safety examination was also justified under the circumstances of the case.